UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**FIRST BAPTIST CHURCH OF LAKE CHARLES LA**    **CASE NO.  2:21-CV-03332**

**VERSUS**                                     **JUDGE JAMES D. CAIN, JR.**

**BROTHERHOOD MUTUAL INSURANCE CO**            **MAGISTRATE JUDGE LEBLANC**

## MEMORANDUM RULING

Before the Court is a "Motion for Partial Summary Judgment" (Doc. 51) filed by Defendant Brotherhood Mutual Insurance Company ("Brotherhood"). In its Motion, Brotherhood asks the Court to rule that Plaintiff's policy limits under the Building Coverage for the Hodges Properties is $18,948,000.00, and that Plaintiff, First Baptist Church of Lake Charles, Louisiana ("First Baptist") cannot recover more than the Policy limits in contractual damages. In the alternative, Brotherhood requests that the Court issue a ruling regarding the Policy Limits available in this matter.

## FACTUAL STATEMENT

On or about August 27, 2020, Hurricane Laura made landfall near Lake Charles, Louisiana, and on or about October 9, 2020, Hurricane Delta made landfall near Lake Charles, Louisiana. First Baptist alleges that both Hurricanes caused significant damages to its properties located at 830 Hodges, 833 Hodges, and 600 Belden. The properties at 830 Hodges and 833 Hodges are the main church campus, and the property at 600 Belden is the mission church.[1]

---

[1] Defendant's exhibit 1, Declaration of Corinne Cable.

During the relevant time period, Brotherhood issued a commercial insurance policy, which provided certain specified coverages with respect to the property.[2] As a result of the damage caused by Hurricanes Laura and Delta, First Baptist filed claims under the commercial insurance policy. First Baptist has received $12,191,087.77 in damages from Brotherhood caused by the Hurricanes.

On May 4, 2021, First Baptist sold the property to The Royal of Lake Charles, LLC. At the time of the sale, the property had not been repaired. Thereafter, First Baptist filed this lawsuit for breach of contract and for bad faith damages pursuant to Louisiana Revised Statutes 22:1892 and 22:1973.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This

---

[2] Defendant's exhibit C, Policy.

requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW AND ANALYSIS

Here, Brotherhood has requested a ruling that Plaintiff's Policy limits under the Building Coverage for the Hodges Properties is $18,948,000.00, and the Plaintiff cannot recover more than the Policy limits in contractual damages, or alternatively, issue a ruling as to the Policy limits in this matter. Brotherhood relies on the "Building Policy Limits" contained in the Schedule of Buildings and Personal Property[3] as follows:

| MAIN CHURCH BUILDING | | 830 Hodges St Lake Charles, LA 70601-4248 | | | | | LOCATION 1/1 |
|---|---|---|---|---|---|---|---|
| COVERAGE DESCRIPTION (INCL. TYPE OF PROPERTY) | COVERAGE LIMIT | COINSURANCE | EQ DED | VALUATION TYPE | AUTO INCR | PERIL TYPE | FORM |
| Building | $18,743,400 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |
| Ordinance or Law-Increased Building Loss(ORD&LAW1) | $18,743,400 | N/A | N/A | N/A | N/A | N/A | BCP138 4.0 |

---

[3] *Id*. p. 2 of 15, CM/ECF p. 14.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Personal Property | $2,100,000 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |
| Personal Property of Clergy | $45,000 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |
| Personal Property of Others | $5,000 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |

| LRO - OFFICE | | 833 Hodges St Lake Charles, LA 70601-4247 | | | | | LOCATION 2/1 |
|---|---|---|---|---|---|---|---|
| **COVERAGE DESCRIPTION (INCL. TYPE OF PROPERTY)** | **COVERAGE LIMIT** | **COINSURANCE** | **EQ DED** | **VALUATION TYPE** | **AUTO INCR** | **PERIL TYPE** | **FORM** |
| Building | $204,600 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |
| Roof | | | | Actual Cash Value (Roof ACV) | | | BCP915 4.0 |
| Ordinance or Law-Increased Building Loss(ORD&LAW1) | $204,600 | N/A | N/A | N/A | N/A | N/A | BCP138 4.0 |

The Policy also defines Loss Settlement, in pertinent part, as follows:

> 3. Loss Settlement Terms: Subject to paragraphs 1., 2., 4., 5., and 6., in this How Much We Pay section, we pay the least of:
>    a. the amount determined under Valuation of Property;
>    b. the cost to repair, replace, or rebuild the property with material of like kind, and quality to the extent practicable; or
>    c. the limit that applies to covered property, as described on the declarations, to which a covered loss has been sustained.[4]

Brotherhood argues that based on these two Policy provisions, the Policy sets the Building Coverage limit of liability for the Hodges Properties at $18,948,000.00. As such, Brotherhood maintains that that any recovery for damage to the Properties under the Policy can be no more than the difference between the Building Coverage Limit and the $12,191,087.77 that First Baptist has already received pursuant to the policy.

First Baptist argues that Brotherhood has failed to acknowledge additional coverage selected by First Baptist that increases the limit beyond the base coverage of $18,743,400.00.[5] First Baptist relies on the following "Other Optional Coverages"[6] that is on the "Ministry*First* commercial multi-peril policy Declarations continued...", which also

---

[4] *Id.* p. 10-11 of 16, CM/ECF p. 162.
[5] *Id.* p. 2 of 15, CM/ECF p. 14. The difference in the parties' building limit is due to Brotherhood including the coverage limit for the 833 Hodges Street building identified as Location 2/1 with a coverage limit of $204,600.
[6] *Id.* p. 6 of 15, CM/ECF p. 18.

states that "[w]e provide the commercial Property coverage at the declared premise(s) for the coverage and limits indicated...."[7]

| COVERAGE DESCRIPTION | COVERAGE LIMIT | DEDUCTIBLE | FORM |
|---|---|---|---|
| Certified and Non-Certified Terrorism Loss | $22,035,005 | $5,000 | BCL0600 3.0 |
| Interior Building Damage Coverage-Including Gutters/ Downspouts Coverage | $22,045,005 | $5,000 | BCP49 4.0 |
| Rented Personal Property of Others | $10,000 | $1,000 | BCP12BLA 4.1 |

First Baptist submits the deposition testimony of Carrie Bair, the Rule 30(B)(6) corporate representative.

> Q. On page 6 of 15, Brotherhood Mutual property coverage summary, we see other optional coverages, right?
>
> A. Correct.
>
> Q. That's consistent with what you already told us, that is there are other coverages that the potential insurer here at First Baptist [sic] can opt to have?[8]
>
> A. Correct.
>
> Q. That here, that First Baptist did elect to add to the coverages it obtained from Brotherhood Mutual, right?
>
> A. Yes.
>
> Q. One of those is interior building damage coverage, and it says including gutters down spouts coverage, right?
>
> A. Correct.
>
> Q. The coverage limit that is the dollar amount available to First Baptist through this type of coverage is $22,045,005, right?
>
> A. Correct.[9]

---

[7] *Id.*
[8] "insurer" should be "insured."
[9] Plaintiff's exhibit A, Carrie Bair Deposition, pp. 87:8-88:3.

First Baptist posits that the Brotherhood Policy includes a coverage limit of not only the base coverage of $18,743,300, but also the $22,045,005 for Interior Building Damage ("IBD") coverage for a total coverage limit of $40,788,305.00.

Brotherhood argues that the IBD is a blanket endorsement, which applies to all the Insured Properties and only serves to expand coverage, but not insurance proceeds.[10] Brotherhood directs the Court to the insurance endorsement regarding Form BCP49 4.0 directly related to the IBD coverage, which, which expressly states that "[t]he policy deductible applies to this additional coverage. This is not an additional amount of insurance."[11]

Brotherhood remarks that historically, property insurance policies only provide coverage for interior damage that occurs as the result of storm-created openings. Brotherhood contends that the IBD endorsement adds coverage for typically excluded items, but does not increase the Policy limits, or double them.

Brotherhood cites *Centrum Corp. v. Landmark American Ins. Co.*, 237 F.App'x 799, 801 (4th Cir. 2007) for the proposition that such an endorsement does not double, or provide additional coverage in excess of the Policy limit as argued by the plaintiff/insured. In *Centrum*, plaintiff argued that the "Ordinance or Law" coverage constituted additional coverage and the insurer argues that it was a "sub-limit of the primary insurance limited. The appellate court affirmed the district court's grant of summary judgment in favor of the insurer finding that the policies in question are scheduled, not blanket, policies. The

---

[10] Defendant's exhibit C, BCP-49 (4.0), pp. 130-131 of 364, Doc. 51-10.
[11] *Id.* p. 2 of 2, CM/ECF p. 152, Doc. 51-10.

Page 6 of 13

primary policy stated that it provided coverage on a "per occurrence, scheduled limits" basis, while the binders states that they are "per occurrence/scheduled limits (NOT BLANKET)." *Id.* at 802.

Brotherhood argues that the IBD of $22,045.005 is the total sum of coverage available for all the properties and denies that it creates any additional insurance proceeds, considering the damages alleged arose out of a storm covered opening. Brotherhood contends that First Baptist cannot rely on the corporate representative's deposition testimony as to the interpretation of the contract because Louisiana law provides that the insurance policy itself is the law between the parties.

In addition to the IBD Coverage limit provided on the above-mentioned Declarations' page, First Baptist relies on the following to support its position that the IBD provides additional insurance amounts:

### AGREEMENT

**We** provide the following additional coverage when this form (BCP-49) is shown on the **declarations.**

### ADDITIONAL COVERAGES

1. **Interior Building Damage:** When Special Perils Part (BCP-85) applies, **we** cover up to the **limit** shown on the schedule above, sudden and accidental direct loss to the interior of buildings or to personal property in the buildings caused by rain, snow, ice, sleet, sand or dust.[12]

Frist Baptist also relies on the "Perils Covered" provision, as follows:

When Special Perils is shown on the **declarations, we** cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

---

[12] *Id.* p. 1 of 2, CM/ECF p. 151, Doc. 51-10.

## PERILS EXCLUDED

1. **We** do not pay for loss if one or more of the following exclusions apply to the loss, regardless of the cause of the excluded cause or event, and regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before at the same time as, or after the excluded causes or events.[13]

The Policy also provides the following loses that are excepted from specific exclusions:

8.     **Interior of Buildings: We** do not cover loss to the interior of buildings or structures or to personal property in the buildings or structures caused by rain, snow, sleet, ice, sand, or dust, unless:

   a. entering through openings made by a **specified peril:** or

   b. the loss is caused by the thawing of snow, sleet, or ice on the building or structure.

Additionally, "Specified Peril" is defined as follows:

2. **Specified Perils:** This means aircraft; civil commotion; breakage of building glass; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; sinkhole collapse; smoke; sonic boom; vandalism; vehicles; volcanic action; water damage from a system or appliance; weight of ice, snow, or sleet; and **windstorm**.[14]

Windstorm is defined in the Policy to include hurricane winds.[15] Thus, First Baptist maintains that because **windstorm** is listed as a Specified Peril, and the loss is caused by rain that enters through openings made by a Specified Peril" the Special Perils Part (BCP-85) provides coverage for loss to the interior of buildings.

First Baptist refers to the above "Special Perils" covered and "additional coverage" to argue that this language should be interpreted to mean that this

---

[13] *Id.* p. 1 of 6, CM/ECF, p. 107, Doc. 51-10.
[14] *Id.*
[15] *Id.* p. 1 of 1, CM/ECR, p. 105, Doc. 51-10.

increases the policy limits, and/or is an additional amount of insurance, despite the endorsement's express language that "this is not an additional amount of insurance."[16] First Baptist notes that "additional amount of coverage" is not defined in the Policy.

First Baptist directs the Court to other provisions in the Policy to shed light on the IBD endorsement. For example, First Baptist elected to purchase "ordinance or Law-Increased Building Loss ("Ordinance or Law Coverage").[17] The pertinent policy language is as follows:

MAIN CHURCH BUILDING          830 Hodges St Lake Charles, LA 70601-4248
LOCATION 1/1

| COVERAGE DESCRIPTION (INCL. TYPE OF PROPERTY) | COVERAGE LIMIT | COINSURANCE | EQ DED | VALUATION TYPE | AUTO INCR | PERIL TYPE | FORM |
|---|---|---|---|---|---|---|---|
| Building | $18,743,400 | Agreed Amount | N/A | Replacement Cost | 0% | Special with Theft | BCP85 4.0 |
| Ordinance or Law-Increased Building Loss(ORD&LAW1) | $18,743,400 | N/A | N/A | N/A | N/A | N/A | BCP138 4.0 |

First Baptist notes that here the Building "Coverage Limit" of $18,743,400 is the same as the Ordinance or Law-Increased Building Loss (ORD&LAW1) and each of the other three Building locations on the Declarations pages have a separately listed Ordinance or Law Coverage limit that likewise mirrors the corresponding building limits.[18] Additionally, the Ordinance or Law Coverage form provides that "[t]his does not increase the applicable limit shown on the declarations for the building. This is not an additional amount of insurance."[19] As noted by First Baptist, the IBD Coverage provisions does not

---

[16] Defendant's exhibit C, p. 2 of 2, CM/ECF p. 152, Doc. 51-10.
[17] *Id.* p. 2 of 15. CM/ECF p.14.
[18] *Id.* pp. 2-3. CM/ECF p. 14-15.
[19] *Id.* p. CM/ECF p. 113.

include any language that "this does not increase the applicable limit shown on the declarations" for the building.

The Court notes that the IBD endorsement provides an express "Coverage Limit" of $22,045,005 for the Interior Building Damage Coverage--Including gutters/Downspouts Coverage and the declarations provides a Building "Coverage Limit" of $18,743,400.

Here, the Court finds that the language on the IBD endorsement—" This is not an additional amount of insurance,"[20] cannot be reconciled with the Coverage Limit for the Optional **Additional Coverage** for the IBD. Therefore, there is an ambiguity in the policy. Consequently, as noted by First Baptist, "[e]quivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured has no voice in the preparation." *Garcia v. St. Bernard par. Sch. Bd.*, 576 So.2d 975, 975 (La. 1991). Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. *Cadwallader v. Allstate Ins. Co.*, 848 So.3d 577 (La. 6/27/03). The determination of whether a contract is clear or ambiguous is a question of law. *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 764 (La. 1/14/94).

When the terms of a written contract are susceptible of more than one meaning, or there is uncertainty or an ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parole evidence is admissible to clarify the

---

[20] *Id.* p. 2 of 2, CM/ECF p. 152, Doc. 51-10.

ambiguity to show the intention of the parties. *Spohrer v. Spohrer*, 610 So.2d 849 (La. App. 1st Cir. 1992).

In her testimony as a corporate representative Ms. Bair testified as follows:

Q. ... Are you generally familiar with that coverage option through Brotherhood Mutual?

A. Yes.

Q. If I purchase the standard MinistryFirst policy without electing any additional coverages, will my policy include, in this time period, interior building damage coverage?

A. No.

Q. This coverage, that is, the BCP 49 4.0, interior building damage coverage, is similar to the systems equipment breakdown coverage in either the agent, the customer, or both must make an election to include or add that additional coverage, right?

A. Yes.

Q. Looking at Exhibit 12 tells us that in this instance either the agent, the customer, or both elected not only the systems equipment breakdown coverage, but also the interior building damage coverage?

A. Yes.

Q. To your knowledge, generally, what does the interior building damage coverage cover? Exactly what it says, interior damage?

A. Yes.

***

> Q. Does Exhibit 24 set forth the scope of the coverage, the terms and conditions, inclusions, and exclusions for Brotherhood Mutual as to this particular coverage?
>
> A. Yes.
>
> Q. Okay. It says under agreement, we provide the following additional coverages, right?
>
> A. Correct.
>
> Q. That, again, it's an additional coverage separate from the building, for example?
>
> A. Correct.
>
> Q. We provide the following additional coverages when this form, BCP49, is shown on the declarations. I read that correctly, right?
>
> A. Yes.[21]

Based on Brotherhood's corporate representative testimony, the Coverage Limit for the Building only applies to the Building, and the Coverage Limit for the IBD only applies to interior damage, gutters and downspouts. Relying on the Corporate representative's testimony and the terms of the Policy, the Court finds that there is a Coverage Limit for the Building of $18,743,400 and a separate Coverage Limit for Interior Building Damage including gutters and downspouts for $22,045,005.

---

[21] Plaintiff's exhibit A, Carrie Bair Deposition, p. 85:20 – 89:25.

## CONCLUSION

For the reasons explained herein, the Court will deny Brotherhood's Motion for Partial Summary Judgment, and further finds that the Policy Limit as to Building Location 1/1 (Main Church Building) is $18,743,400 and the Policy Limit as to Interior Building Damage Coverage—Including Gutters/Downspouts Coverage is $22,045,005.

**THUS DONE AND SIGNED** in Chambers on this 19th day of July, 2024.

_____
**JAMES D. CAIN, JR**
**UNITED STATES DISTRICT JUDGE**